1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILED**

AUG 2 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL ANTHONY VICTORY,

　　　　Petitioner,

vs.

GAIL LEWIS,

　　　　Respondent.

)
)
)
)
)
)
)
)
)
)

No. C 03-1061 JSW (PR)

**ORDER DENYING
PETITION FOR WRIT OF
HABEAS CORPUS**

(Docket No. 38)

**INTRODUCTION**

Michael Anthony Victory (hereinafter "Petitioner"), a prisoner of the State of California, filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. On March 15, 2004, this Court ordered Respondent to show cause why a writ should not issue. Respondent filed a motion to dismiss the petition as not fully exhausted which was granted and Petitioner was ordered to make an election regarding his unexhausted claims. Petitioner requested a stay of the proceedings while exhausting his unexhausted claims.

Thereafter, Petitioner filed an amended petition including all exhausted claims and this Court ordered Respondent to show cause why the writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof and Petitioner filed a traverse. For the reasons stated below, the petition is denied on the merits.

**PROCEDURAL BACKGROUND**

On May 27, 1998, a Santa Clara County Superior Court jury convicted Petitioner of assault with intent to commit rape, kidnap with intent to commit rape, torture, assault by means of force likely to cause great bodily injury and misdemeanor resisting an officer. Cal. Penal Code §§ 220, 208(d), 206, 245(a)(1), 148(a). Petitioner was sentenced to the upper term of

1  eleven years for the kidnapping, a consecutive life term for the torture, and a concurrent jail

2  term for resisting arrest. Petitioner's upper term sentence on the assault counts of six and four

3  years respectively were stayed.

4  Petitioner appealed to the California Court of Appeal. The California Court of Appeal

5  denied relief on all claims and affirmed Petitioner's conviction and sentence on May 10, 2000.

6  *People v. Victory*, No. H018929, slip op. at 1 (Cal. Ct. App. May 10, 2000) (Resp. Ex. A). The

7  Supreme Court of California denied Petitioner's petition for review on August 23, 2000.

8  Petitioner filed a habeas corpus petition in Santa Clara Superior Court, which was denied on

9  September 10, 2001, in the California Court of Appeals, which was denied March 13, 2002, and

10  in the California Supreme Court, which was denied on February 11, 2003.

11  Petitioner filed the instant action on March 11, 2003. After Petitioner's motion to hold

12  this petition in abeyance was granted, Petitioner filed a further habeas petition in the California

13  Supreme Court, which was denied on May 16, 2006. Petitioner's amended petition was filed in

14  this Court on March 29, 2007.

15  **FACTUAL BACKGROUND**

16  The facts underlying the charged offenses, as found by the California Court of Appeal,

17  are summarized as follows:

18  On Saturday, July 5, 1997, the victim, Kia Freitas, left a Safeway store
with her groceries and went back to the parking lot to drive home. A motor home
19  or RV, which had not been there when she had arrived 10 minutes earlier, was
parked so close to the driver's side of her vehicle that she had to load her
20  groceries on the passenger's side. When she went to the driver's side to get in,
the side door of the RV flew open. Dorothy Fischer, another customer who had
21  been watching Freitas, saw a man grab Freitas and drag her inside the RV.
Fischer went inside the store to get help.
22

23  Freitas identified appellant as the man who grabbed her. As he pulled her
inside the RV he had his hand over her mouth and pressed a hard metallic object
24  into her ribs. Unable to breathe, Freitas eventually pulled appellant's hand away
and screamed. Appellant grabbed her by the hair and said, "shut up, bitch." He
25  slammed her head against the counter, causing a cut that left a permanent scar
one-half to three-quarters of an inch long. Freitas fell on her back and appellant
26  got on top of her, straddling her waist. Appellant then pressed a stun gun into her
calf through her jeans, causing a shock that lasted for about five seconds. Freitas
27  described the sensation as making her whole body shake; her brain seemed to be
"wrapped around inside [her] head and squishy."
28

2

Appellant told her to "stop fighting," and he moved the device to the skin on the upper part of her arm, applying a shock lasting six or seven seconds. Her arm and fingers were numb and again her whole body shook. She began to weaken and felt as if she was "going in and out." She managed to turn onto her stomach, but appellant pressed the device against her neck and applied a six-second shock. Each time he shocked her he held her down, so she was unable to jerk away.

Freitas tried to scream as loudly as she could, while appellant tried to put his hands over her mouth. Appellant appeared to be "in a rage;" it seemed as if he "hated [her] guts," though she had never met him before. After applying the stun gun to her neck, appellant said, "bitch, I'm going to make you pay, bitch. I'm going to make you pay, you fucking bitch. I will make you pay. I will beat the shit out of you." Freitas had turned onto her back again. Appellant wrapped his hands around her throat and squeezed hard, cutting off her air supply. While choking her, and with a look of hate on his face, he banged her head against the floor four or five times and continued to tell her he was going to make her pay.

Freitas's arms were free, so she tried to punch and kick him. At one point she grabbed his testicles, causing him to stumble. As she tried to scramble away, appellant grabbed her by the throat again and resumed choking her. Then appellant put one hand over her mouth and the other hand over her nose, squeezing so hard his fingernails broke the skin. Appellant straddled her back, with his knees digging into the center of her back. Keeping his hands over her nose and mouth so she couldn't breathe, appellant pulled her neck back so hard she thought it would snap. He held it that way for "a good eight seconds."

Suddenly appellant put a handcuff on her left wrist. She decided that if he handcuffed her other hand, "that was it;" she "would not come back." With renewed energy Freitas stood up and ran to the door. Appellant grabbed her again and repeatedly bounced her body and head off the door. The next thing Freitas could remember was looking up from the floor and seeing an open door. She ran out the door and collapsed on the pavement in front of a crowd of onlookers.

In addition to the cut on her forehead, Freitas suffered bruises on her legs, arms, back, stomach, and ribs. There were marks on her body left by the stun gun. Her face was swollen for a few days, her eyes turned red from the choking,[1] she had "really bad" carpet burns on her elbows, and she generally felt as if she had been "run over by a truck." She missed a week of work and did not recover physically for about three weeks.

During the struggle with appellant Freitas recalled hearing people banging on the outside of the RV, urging appellant to let her go. She heard appellant tell them to mind their own business; he said she was his wife and they were having an argument. Freitas did not remember a man coming inside the RV to help her. Terrence Standing-Elk testified, however, that he attempted to intervene twice.

---

[1] Medical testimony indicated that choking can result in hemorrhages of the blood vessels in the eyes, producing redness.

3

He and his wife were leaving the Safeway when he heard an older woman telling people that someone was being assaulted. Walking over to the RV, Standing-Elk heard a woman screaming inside. The motor home itself was shaking violently. After calling to the people inside and receiving no answer, he opened a door and went inside. He saw the victim on her stomach; appellant was on top of her with his arms around her neck, arching her back "way up." He was trying to put handcuffs on her. Standing-Elk asked what was going on. Appellant told him to get out because it was his wife and they were having a domestic dispute. Appellant looked "like a shark in water after meat." Standing-Elk twice asked him to stop, but appellant told him to leave. Standing-Elk went into the back and pushed appellant. Appellant released his grip on Freitas, and Standing-Elk left.

Outside he told bystanders what appellant had told him, and they told him the police were on the way. Then he heard screams and the RV began shaking again. At his wife's urging he returned to the vehicle. This time only the driver's door was open, but he went inside and pulled the curtain back. Appellant was choking the victim and trying to handcuff her. When Standing-Elk asked what he was doing, he did not respond. Standing-Elk reached behind Freitas and opened the door. She then slipped out. As Standing-Elk began to leave, he noticed the keys in the ignition and appellant trying to hurry into the driver's seat. Standing-Elk asked him where he was going; appellant said he was going to "get the hell out of here." Standing-Elk restrained appellant in a martial arts hold that immobilized him until the police arrived.

When the first police officer arrived, he found two citizens holding appellant down in the front seat of the RV. Appellant insisted he was just having a fight with his girlfriend and that he wanted to be left alone. It took two police officers and the use of batons and pepper spray to subdue and arrest him.

A search of the RV revealed a large open folding knife, a black blindfold, black duct tape, scissors, a working stun gun, leather "bondage" mittens, a black leather jacket, a black leather face mask, a ball strap and gag, a set of "hobble cords"[2] wrapped around a post, and a canister of mace. In a pocket of the jacket were a couple of pairs of disposable handcuffs. A black leather bag contained a second set of hobble cords and a black leather strap. Another bag contained leather gloves, a whip, pieces of leather, two dildos, a chain with two clips on each end, a handcuff box, and a tube of Anal Ease desensitizing lubricant. Another bag held some "S and M type" magazines, some kind of jelly, and a used pair of rubber gloves.

. . . .

David Carranza was the owner of Leather Masters, a store specializing in "bondage paraphernalia." In the early afternoon of July 5 appellant consulted Carranza about a product and then bought some "bondage mitts" and a tube of

---

[2] Office Henry, who had collected the evidence inside the RV, explained that hobble cords look like nylon rope with metal snaps at the ends. The police use them to bind suspects' feet and attach the feet to handcuffs behind them.

Anal Ease. Testifying as an expert on the subject of bondage, Carranza explained the use couples made of several of the items found in the RV. Anal Ease, for example, numbed the area to make anal intercourse less painful. He did not think someone who wished to cause pain would buy such a product. Bondage mitts are often used because they can restrain a person with more comfort than handcuffs.

Carranza distinguished between sadomasochism and bondage. In bondage, he said, someone enjoys being bound, gagged and subjected to sensory deprivation. About half of his customers were involved in sadomasochism, in which pain is inflicted on a consenting partner. . . .Carranza affirmed that stun guns were sometimes used by sadomasochists, though he did not sell them in his store because he believed they were "borderline safe." He also agreed that during a fantasy of inflicting pain, there could be degrading talk, such as "you fucking bitch, you're going to pay now."

. . . .

After his arrest appellant gave his account of the events to his friends and family members. He told his work supervisor that it was a "justified assault." He said she had bumped into him, and he "had a choice of either punching her out or zapping her. He chose to zap her." He told [his friend, David] Jasak that he had startled Freitas when he came out of the RV, and she "went ballistic and hysterical on him." She pushed him and he fell backward into the RV. As he reached out he grabbed her and pulled her with him into the RV. After that he only tried to "calm her down. . . ."

Appellant told his girlfriend, Patricia Ramirez, that he had startled a woman while coming out of the RV, and they had had an "altercation" that "got stupid and the stun gun was used." He gave his mother an account similar to the one he told Jasak. Appellant said that he had bumped into the victim, and she had pushed him back. As he fell back he grabbed her arm to break the fall, and they both fell into the RV. The victim fought with him and tried to "goug[e] his face" with her keys. Appellant, worried about a prior serious injury to his jaw, tried to calm her down, but she was frantic. The stun gun was ineffective. He could have "punched her out" but did not want to hurt her, and he reached for the handcuffs so he could calm her down and talk to her.

Patricia Ramirez, appellant's girlfriend, testified on his behalf. She stated that she and appellant had planned to take the RV to Gilroy that weekend, beginning at 7 p.m. that evening, to go to a swinger's club where acts of "bondage and discipline" sometimes took place. They had planned to watch the activity there, and then go into the camper and "do our own role playing with our toys." Afterward they were going to go camping in Santa Cruz. Ramirez had seen appellant's stun gun and some of his "toys."

Ramirez explained that they occasionally engaged in bondage, though not often. They had agreed that they were not interested in inflicting pain, and appellant had never physically or verbally abused her. . . . They had never used the stun gun as part of their sexual activity.

5

Resp. Ex. A at 1-8.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Id.* As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey,* 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams,* 529 U.S. at 405-07), *overruled in part on other grounds by Lockyer v. Andrade,* 538 U.S. 63 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in

6

its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

## DISCUSSION

### I.    Jury Instruction on Great Bodily Injury

Petitioner was convicted of assault upon the person of another by means of force likely to produce great bodily injury in violation of Penal Code Section 245(a)(1), which was defined for the jury using a modified version of CALJIC 9.02. RT at 686-87. The instruction defined great bodily injury as "significant or substantial bodily injury or damage. . . [not] trivial or insignificant injury or moderate harm." RT at 686. Petitioner requested that the examples of "prolonged loss of consciousness, severe concussion, protracted loss of any bodily member or organ, protracted impairment of function of any bodily member or organ or bone, a wound or wounds requiring extensive suturing, serious disfigurement, or severe physical pain inflicted by torture" be added to the jury instruction to "flesh out and analogically control the meaning of" the term "great bodily injury" as discussed in *People v. Kimbrel*, 120 Cal. App. 3d 869, 875 (1981). The trial court agreed and added the examples but, over Petitioner's objection, omitted the word "prolonged" from the example of unconsciousness. RT at 545, 687.

Petitioner argues that the failure of the trial court to retain the word "prolonged" in the

7

jury instruction allowed the jury to find great bodily injury from temporary and superficial minor injuries alone and, thus, resulted in a misrepresentation of state law. Traverse at 9. Also, Petitioner argues that the omission interfered with his ability to present his theory of defense and therefore violated his right to due process.

The California Court of Appeal found that the jury instruction, even without the word "prolonged," was a correct statement of state law. Resp. Ex. A at 9. The court noted that "no current authority supports the assumption that loss of consciousness must be prolonged to constitute great bodily injury." *Id.* (citing *People v. Escobar*, 3 Cal. 4th 740, 749-50 (1992)). Additionally, the court found that even if an instructional error had occurred, it was harmless because the other injuries suffered by the victim beyond loss of consciousness "provided a sufficient factual basis for a finding of 'significant or substantial physical injury.'" Resp. Ex. A at 9.

## A. Legal Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). *See, e.g., Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review); *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (failure to define recklessness at most error of state law where recklessness relevant to negate duress defense and government not required to bear burden of proof of duress), *cert. denied*, 488 U.S. 926 (1988). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.*

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

Although a state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings, *see Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988), a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence). However, the defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory, *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979), nor to an instruction embodying the defense theory if the evidence does not support it, *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). Nor is a defendant entitled to instructions on the defense theory of the case, when the state courts have determined that the requested instruction is found to be inapplicable under state law. *Hendricks v. Vasquez,* 974 F.2d 1099, 1107 (9th Cir. 1992) (citing *Estelle v. McGuire,* 502 U.S. at 67-68).

15

16

17

18

19

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

20

21

22

23

24

25

26

27

Even if there is an instructional error, a habeas petitioner is not entitled to relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment

28

1  should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

2  **B.    Analysis**

3  Contrary to Petitioner's assertion, omitting the word "prolonged" from the jury

4  instruction did not result in a misstatement of state law. In *Escobar*, the California Supreme

5  Court stated that a finding of great bodily injury "contains no specific requirement that the

6  victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of

7  bodily function." *Escobar*, 3 Cal. 4th at 750. Further, the court noted that the "term 'great

8  bodily injury' has been used in the law of California for over a century without further

9  definition and the courts have consistently held that it is not a technical term that requires

10  further elaboration." *Id.* at 750 n.3 (quoting *People v. La Fargue*, 192 Cal. Rptr. 438, 442 (Cal.

11  Ct. App. 1983) (citation omitted)). Because the jury instruction, even without the word

12  "prolonged," was a correct statement of state law, the California Court of Appeals reasonably

13  found that Petitioner received adequate instructions for that charge. Therefore the trial court's

14  omission of the world "prolonged" from the instruction is not contrary to, or involved an

15  unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d).

16  

17  Further, it cannot be said that the omission of the word "prolonged" from the requested

18  instruction contravened Petitioner's right to have jury instructions on his theory of defense in

19  violation of his constitutional rights. *See Conde*, 198 F.3d at 739. Petitioner was not precluded

20  from arguing that the injuries suffered here including loss of consciousness, did not rise to the

21  level of great bodily injury, as defense counsel argued in summation. *See* RT at 610-14; 633-

22  34; 645-46.

23  

24  Even assuming that an instructional error had occurred, actual prejudice must result

25  before habeas relief can be granted. *Brecht*, 507 U.S. at 637. The California Court of Appeal

26  found that any such error would have been "harmless beyond a reasonable doubt, since the

27  victim suffered other injuries that provides a sufficient factual basis for a finding of 'a

28  

10

significant or substantial physical injury.'" Resp. Ex. A at 9. In this case, the victim testified that Petitioner had bounced her head off the counter of his motor home, that he shocked her with a stun gun three times for increasingly long intervals of time, that he choked her while continuously banging the back of her head on the floor, that he had changed his grip on her neck so he could choke her while covering her mouth and nose, and when she stood up to try to escape he slammed her body and her head off the door continuously until she lost consciousness. RT at 105-18. Standing-Elk testified that when he entered the motor home to investigate the screaming from inside, he observed Petitioner choking the victim. RT at 334, 337. Finally, the expert in injuries to the human body and their causes testified that the hemorrhaging in the victim's eyes was consistent with strangulation. RT at 157-158. Irrespective of any instructional error, the evidence before the jury was more than sufficient to support a finding that the victim was attacked with force likely to produce great bodily injury. Therefore, the California Court of Appeal's denial of relief on this claim was not contrary to, or an unreasonable application of, federal law.

## II.    Insufficient Evidence Claims

Petitioner claims that his convictions of assault with intent to commit rape, kidnapping with intent to commit rape, and torture are not supported by sufficient evidence in the record and therefore violate his right to due process. He argues specifically that he did not have the intent to commit rape. Also, he argues that he did not have the intent to cause cruel or extreme pain and suffering as necessary to find him guilty of torture. Lastly, he argues that there was not sufficient evidence of asportation to find him guilty of kidnapping.

### A.    Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the

11

evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief. *See Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Mere suspicion and speculation cannot support logical inferences, however. *Id.*; *see, e.g.*, *Juan H. v. Allen*, 408 F.3d 1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual inferences in favor of prosecution, only speculation supported petitioner's conviction for first degree murder under a theory of aiding and abetting).

**B.     Analysis**

**I.     Intent to Commit Rape**

The California Court of Appeal agreed that there was no direct evidence of Petitioner's intent to rape the victim, but found that there was sufficient circumstantial evidence that the jury

12

could have relied upon to support its finding that Petitioner intended to commit rape. Specifically, the Court of Appeal relied on the following evidence offered at trial: the camper had enough food for the weekend; it was equipped with sexual implements that Petitioner had bought that day; Petitioner had other "bondage and discipline" items; some of these items were in plain view and easy to access; there were hobble cords already set up for use; and Petitioner's girlfriend "had expected [Petitioner] to pick her up at 7 p.m., just after he seized [the victim]." Resp. Ex. A at 11. The court reasoned from the jury's finding of guilt that it must have adopted the prosecutor's argument that Petitioner "had planned to abduct a woman and subject her to 'bondage and S and M,' either with Ramirez or without her." *Id.* (footnote omitted). Therefore, in viewing the evidence in the light most favorable to the judgement, the court concluded that it could not "say as a matter of law that the jury's finding of intent was based solely on speculation rather than an inference from the circumstances." *Id.*

The California Court of Appeal's decision was not contrary to, or an unreasonable interpretation of, the *Jackson* standard. The appellate court looked at the totality of evidence presented at trial and concluded that a rational trier of fact could have found beyond a reasonable doubt that Petitioner intended to commit rape.

California courts have found that when a victim is attacked with an inexplicable motive, there may be sufficient circumstantial evidence to show an intent to commit rape. *See People v. Collier*, 249 P.2d 72, 76 (Cal. Ct. App. 1952); *see also People v. Nye* 237 P.2d 1, 3 (Cal. 1951) ("When a strange man enters a woman's bedroom, covers her mouth with his hand, grasps her wrist while she screams and kicks, releases her when she bites his hand, and makes no effort to take any property, it is reasonable to infer that he intended to commit rape. . . .")

In the instant case, the appellate court identified the circumstantial evidence of intent presented at trial which a reasonable jury could have relied on to find Petitioner's intent. *Id.* Petitioner grabbed the unsuspecting victim from behind and pulled her into his motor home. RT

13

at 82, 94, 104. His motor home was stocked with numerous sexual instruments and "bondage and discipline" paraphernalia. Resp. Ex. A at 5. Petitioner expended great effort to try to restrain the victim; beating her continuously, shocking her with a stun gun and attempting to handcuff her. RT at 105-18. Additionally, the language Petitioner used when accosting his victim helped evidence his intent. The victim testified that Petitioner said, repeatedly, "bitch, I'm going to make you pay, bitch" as he attacked her. RT at 113. When this phrase was repeated to the expert in "bondage," he testified that this would be the kind of degrading talk that could be expected when one was acting out a sexual fantasy about rape. RT at 326.

As in *Collier* and *Nye*, here, Petitioner made no attempt to take money or property from his victim. In fact, in his closing, defense counsel admits that Petitioner's behavior is without rational explanation. RT at 623 ("Michael made a huge mistake. We're not even going to try to explain it. It can't be explained.") Although all of this evidence was circumstantial, the evidence was abundant and went beyond "mere suspicion and speculation" in supporting the inference that Petitioner had the intent to commit rape. *Walters*, 45 F.3d at 1358; *see, e.g., Juan H.*, 408 F.3d at 1278-79.

Petitioner argues that the evidence at trial court supported a conflicting conclusion: that Petitioner harbored no intent to commit rape because the sexual paraphernalia was unrelated to the incident charged. With its verdict, the jury determined that the opposing inference, that Petitioner did have the requisite intent, was more reasonable. Petitioner urges that because both inferences were reasonable, the presumption of innocence that protects the accused should have forced the jury to weight the evidence in his favor.

In addressing this issue the California Court of Appeals noted, "[i]t is not our function to reweigh this evidence." Resp. Ex. A at 10. Likewise, upon habeas review, this Court must only determine whether, "based upon circumstantial evidence, . . . the circumstances reasonably justify the findings of the trier of fact . . . [O]ur opinion that the circumstances also might

14

1  reasonably be reconciled with a contrary finding would not warrant a reversal of the judgment."

2  *Id.* (quoting *People v. Proctor*, 842 P.2d 1100, 1115 (Cal. 1992)); *see also Payne*, 982 F.2d at

3  338 (A federal court reviewing collaterally a state court conviction does not determine whether it

4  is satisfied that the evidence established guilt beyond a reasonable doubt.)

5  While Petitioner presented significant evidence in support of his defense, this Court

6  cannot say that *no* rational trier of fact could not have found proof of guilt beyond a reasonable

7  doubt. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. Therefore, Petitioner is not

8  entitled to federal habeas relief on this insufficient evidence claim because the California Court

9  of Appeal's rejection of the claim was not contrary to, or involved an unreasonable

10  determination of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

11

12  ## ii.  Intent to Cause Cruel or Extreme Pain and Suffering

13  Torture, as defined by California Penal Code Section 206, criminalizes the infliction of

14  great bodily injury upon another person by one intending to cause cruel or extreme pain and

15  suffering "for the purpose of revenge... or for any sadistic purpose." Cal. Penal Code § 206.

16  Petitioner claims there was insufficient evidence to support the jury's finding that he formed the

17  requisite intent. The California Court of Appeal disagreed. Resp. Ex. A at 14. The court relied

18  on nine pieces of circumstantial evidence that supported its conclusion: Petitioner slammed

19  victim's head on the counter, floor, and door; he choked her twice; he shocked her with a stun

20  gun three times in succession for increasingly long intervals of time; when she screamed he said

21  "Shut up, bitch," and bounced her head off the counter; after using the stun gun, Petitioner said,

22  "bitch, I'm going to make you pay, bitch... I'm going to make you pay, you fucking bitch. I

23  will make you pay... I will beat the shit out of you... [;]" he wrapped his hands around her

24  throat and prevented her from breathing; he banged the back of her head on the floor four of five

25  times; he put handcuffs on her after he choked her again; and he arched her back in such a

26  contorted position that she felt her neck was going to snap. *Id.* at 12-13. The court noted that

27

28

15

1  two reasonable, albeit conflicting, inferences might be drawn from this evidence: that Petitioner

2  "intended only to subdue and restrain her, or that it was intended to cause her cruel or extreme

3  pain and suffering." *Id.* at 13.  However, the jury's judgment reflects that it believed the latter

4  inference.  Since evidence can be deemed insufficient to support the judgment "[o]nly if no

5  rational trier of fact could have found the requisite intent beyond a reasonable doubt[,]" the

6
   appellate court concluded that it could not interfere with the reasonable factual findings of the

7
   jury. *Id.* at 13.

8

9       When the evidence in the record supports conflicting inferences, a federal habeas court

10  "must presume – even if it does not affirmatively appear on the record – that the trier of fact

11  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

12  *Jackson*, 443 U.S. at 326.  Viewing the evidence in the light most favorable to the prosecution,

13  there is ample support for the jury's finding that Petitioner formed the requisite intent.  Any one

14  of the nine pieces of circumstantial evidence relied on by the Court of Appeal may have been

15  sufficient standing alone to support the jury's finding of intent.  Therefore, the California Court

16  of Appeal's rejection of this claim was not contrary to, or an unreasonable determination of,

17  clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

18                    **iii.    Asportation**

19       Under California law, kidnapping for rape has been defined as movement of a victim

20  "that is not merely incidental to the commission of the [crime], and which substantially increases

21
   the risk of harm over and above that necessarily present in the crime. . . itself." *See People v.*

22
   *Rayford*, 9 Cal. 4th 1, 12 (Cal. 1994) (finding these two prongs defined the asportation element

23
   of aggravating kidnapping and then subsequently finding that the asportation standard for

24
   kidnapping for rape was that applied to aggravating kidnapping).  Under the first prong of this

25  standard, the jury considers the scope and nature of the movement to determine whether the

26  victim's movement is merely incidental to the underlying crime.  "This includes the actual

27

28

16

distance the victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong." *Id.* Under the second prong, the jury considers the risk of harm to the victim, such as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the defendant's enhanced opportunity to commit more crimes. *Id.* at 13.

Petitioner claims that there is insufficient evidence of asportation to support his conviction for kidnapping for the purposes of rape. He notes that he removed the victim from the narrow space between her car and his motor home then moved her two and one-half feet into his vehicle. He argues that the movement was not substantial in distance and that it was not merely incidental to the allegedly intended rape because it would have been impossible to commit the rape without the movement. Traverse at 18. Though Petitioner states briefly that the increased risk of harm was much less than a comparable case in which the California Court of Appeal found sufficient asportation to sustain a conviction of kidnapping for sexual purposes, Traverse at 19 (citing *People v. Salazar*, 33 Cal. App. 4th 341, 345 (1995), he concedes in his petition that the movement increased the harm to the victim. Pet. at 10.

The California Court of Appeal found sufficient evidence of asportation to support Petitioner's conviction on that count. Resp. Ex. A at 15. The court determined that although the victim was only moved a short distance, the scope and the nature of the movement made it significant. *See id.* The court found that in the motor home, the victim "would be out of public view and. . . could be more easily restrained, assaulted, and possibly even transported." *Id.* The court noted that even though "the victim was moved only a short distance. . . [the new] location provided less likelihood of detection and a greater opportunity to perpetrate additional crimes." *Id.* Thus, the court concluded, "the 'scope and nature' of the movement permitted a finding that it was not 'merely incidental' to the attempted commission of a sex crime." *Id.*

The California Court of Appeal reasonably rejected Petitioner's claim. Petitioner focuses

17

1   primarily on the short distance the victim was moved. However, the California Supreme Court
2   has held that "there is no minimum number of feet a defendant must move a victim in order" for
3   the movement to be considered substantial. *Rayford*, 9 Cal. 4th at 12. Rather, this movement
4   was significant because the new destination substantially altered the quality of the crime.
5   Petitioner argues that it was not "reasonable" to believe that a rape could have occurred "within
6   mere seconds, outside the RV in a public parking lot, in a space of approximately 2 ½ feet, in
7   broad daylight, on a holiday weekend, in the view of the mass public, and the presence of a large
8   Black Lab[r]ador Retriever barking in the front cab of the RV." Traverse at 18. These facts do
9   
10  not show that the crime of rape could not have occurred. Instead, as the California Court of
11  Appeal found, they indicate only that the crime could not have occurred in the manner Petitioner
12  intended. *See* Resp. Ex. A at 15 (citing a California case for the analogous proposition that
13  "while the movement was perhaps incidental to [Petitioner's] particular plan for rape, it was not
14  incidental to the actual commission [or attempted commission] of the crime itself." (citation
15  omitted)). Because the movement of the victim in this case significantly altered the crime's
16  scope and nature, the movement was not merely incidental to the crime of rape.

17      Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact
18  could have found the essential elements of kidnapping for rape proven beyond a reasonable
19  doubt. The California Court of Appeal's decision, that the movement into the motor home was
20  sufficient evidence of movement not incidental to the rape, was not contrary to or an
21  unreasonable application of clearly established federal law. Petitioner is not entitled to the writ
22  on this claim.
23

24  **III.   Griffin Error**

25      In his closing argument the prosecutor commented on the failure of defense counsel to
26  present a complete theory of defense with the following statement: "[Defense counsel] has never
27  really told us why the Defendant was attacking this woman. If he was attacking her, he must
28

18

have had a reason, right? What was the reason?" RT at 656. The prosecutor went on to argue that the only reason must have been for sex. Petitioner argues that the prosecutor was indirectly commenting on Petitioner's failure to testify because Petitioner's testimony could be the only satisfactory way intent could be explained. Traverse at 20. Petitioner also argues that the comments led to the impermissible inference that his "failure to take the stand was proof he didn't have any other motive." Traverse at 21.

## A.    Legal Standard

Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, or to treat the defendant's silence as substantive evidence of guilt, the defendant's privilege against compulsory self-incrimination is violated. *Griffin v. California*, 380 U.S. 609, 615 (1965). A comment is impermissible if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify. *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citing *United States v. Bagley*, 772 F.2d 482, 494 (9th Cir. 1985), *cert. denied*, 475 U.S. 1023 (1986)).

However, such commentary by the prosecutor requires reversal only if "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) (citation omitted), *cert. denied*, 510 U.S. 1191 (1994). Put differently, such improper commentary warrants reversal only if it appears that it may have affected the verdict. *See Lincoln*, 807 F.2d at 809; *see also United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1132 (9th Cir. 2005) (holding that comment on the defense's failure to explain introduced testimony or evidence does not infringe on defendant's Fifth Amendment rights); *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) (prosecutor's comments not improper where they simply reminded jury that defense had failed to

19

1  present certain evidence).

2  **B.    Analysis**

3
4  The California Court of Appeal analyzed Petitioner's claim under the *Griffin* standard.
5  The court explained that the *Griffin* holding does not extend to comments on the state of the
6  evidence and that the prosecutor's comments in this case were directed to the general failure of
7  the defense to provide a rational explanation as to what else could have motivated Petitioner to
8  attack the victim. The court found that just because Petitioner's intent was at issue "does not
9  mean that a comment on the absence of controverting evidence is equivalent to a comment on
10 [Petitioner's] failure to testify." Resp. Ex. A at 17. As the prosecutor's comments were a
11 permissible reference to the state of the evidence, the court found that no *Griffin* error occurred.
12 *Id.* at 16-17.

13 The prosecutor's comment in the instant case did not directly reference the fact that
14 Petitioner did not testify. Even if the prosecutor's comment may have been improper, such
15 comments do not warrant reversal where they are limited and do not stress Petitioner's failure to
16 testify as a basis for the conviction. *See Jeffries*, 5 F.3d at 1192. In *Guam v. Ojeda*, 758 F.2d
17 403 (9th Cir. 1985), the Ninth Circuit addressed a similar claim. In *Ojeda*, the prosecutor noted
18 in his closing argument that "[t]here had been no testimony" showing that Ojeda lacked the
19 necessary intent to be convicted of burglary. *Id.* at 407. The Ninth Circuit held that "where
20 alleged prosecutorial misconduct is limited to a single isolated statement, did not stress an
21 inference of guilt from silence as a basis for conviction, and was followed by curative
22 instructions, it is harmless beyond a reasonable doubt." *Id.* Here, the prosecutor made an
23
24 isolated comment during his closing argument. The prosecutor did not stress an inference of
25 guilt from Petitioner's silence. Rather, he was highlighting the fact that the defense counsel
26 failed to present a complete theory of the case when he, in contrast, had, and had thereby met his
27 burden of proof. This Court finds that the prosecutor's comment was harmless under the

28

20

1  circumstances here.

2  Petitioner refers this Court to numerous other comments the prosecutor made for an
3  evaluation of whether they also constitute *Griffin* errors. Traverse at 19. These additional
4  *Griffin* claims are not properly before this Court because Petitioner does not specifically
5  reference what statements he believes are in error. This Court cannot speculate what statements
6
7  Petitioner believes contravened his constitutional rights.

8  Accordingly, the California Court of Appeal's conclusion that the prosecutor's comment
9  did not constitute a *Griffin* error is not contrary to Supreme Court precedent as required by
10  section 2254(a)(1) and Petitioner's claim is denied.

11  **IV.  Prosecutorial Misconduct**

12  Petitioner makes four separate claims of prosecutorial misconduct. First, he claims that
13  the prosecutor misstated the law to the jury in his closing argument. Traverse at 24. Second, he
14  claims that the prosecutor's reference to facts outside the record unduly prejudiced the jury.
15  Traverse at 26. Third, he claims that by characterizing the lesser included offenses as a "plea
16  bargain," the prosecutor unduly prejudiced the jury. Traverse at 29. Finally, Petitioner claims
17  that the prosecutor, in his response to defense counsel's closing argument, asserted his own
18  personal belief in Petitioner's guilt, thereby prejudicing the jury. Traverse at 29.

19  **A.  Legal Standard**

20  Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate
21  standard of review is the narrow one of due process and not the broad exercise of supervisory
22  power. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights
23  are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *See id.*;
24  *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of
25  alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the
26  prosecutor"). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the
27
28

21

entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

Ordinarily, the first factor in determining the prejudicial effects of misconduct is whether the trial court issued a curative instruction. When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *See Greer*, 483 U.S. at 766 n.8.

**B.     Analysis**

**I.     Misstating the Law**

In his closing argument, the prosecutor advised the jury in which order to consider the charged crimes as follows:

> The first thing you do is decide the charged crime. If you say he's guilty of the charged crime, end of question. You don't ever get to the lesser place. You do that with every single one. You only get to the lesser ones if for some reason all twelve of you decide he's not guilty of the charged crime.

RT at 560. Petitioner argues that this was a misstatement of the law because it prohibited the jury from considering the lesser included offenses before a determination of guilty or innocence was made on the greater charged crimes. Petitioner correctly asserts that if the statement was interpreted as he suggests it may have been, then it would be contrary to the jury's prerogative under CALJIC No. 17.10 which provides in relevant part: "you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before

22

1  reaching any final verdict." CALJIC No. 17.10.

2  The California Court of Appeal determined that the prosecutor's statements, when viewed

3  in the context of an introduction to the verdict form, did not improperly characterize the law.

4  Resp. Ex. A at 19. However, the appellate court conceded that such statements could have been

5  misinterpreted. *Id.* In the event of any remaining ambiguity, the court found that the trial court's

6  instructions to the jury resolved it. *Id.*

7

8  The trial court recited the above quoted passage of CALJIC No. 17.10 and added further,

9  clarifying on its own initiative, that "the Court cannot accept a guilty verdict on a lesser crime

10  unless you have unanimously found Defendant not guilty of the crime charged." RT at 689. In

11  addition, the trial court made clear with its own instructions that "[i]f anything concerning the

12  law said by the attorneys in their argument or at any other time during trial conflicts with my

13  instructions on the law, you must follow my instructions." RT at 668 (reciting a modified

14  version of CALJIC No. 0.50). Even assuming the prosecutor erred in stating the law, the

15  appellate court concluded that any such error was not prejudicial. Resp. Ex. A at 19.

16  The California Court of Appeal reasonably found that, assuming the prosecutor's

17  statement was in error, any misconduct did not give rise to a due process violation. In evaluating

18  Petitioner's claim, this Court has considered five factors: whether the trial court issued a curative

19  instruction, *Darden*, 477 U.S. at 182, whether a prosecutor's comment misstates or manipulates

20  the evidence, *id.*, whether the misconduct relates to a critical part of the case, *Giglio*, 405 U.S. at

21  154, whether the misconduct was isolated or part of an ongoing pattern, *Lincoln*, 807 F.2d at

22  809, and the weight of evidence of guilt, *Young*, 470 U.S. at 19.

23

24  In the instant case, the trial court gave both CALJIC No. 17.10 – correctly stating the law

25  on finding lesser included offenses – and CALJIC No. 0.50 – articulating the supremacy of the

26  trial court's statements of law over an attorney's statements. RT at 689, 668. In addition, there

27  was substantial evidence that Petitioner was guilty of the crimes as charged. For the assault and

28

23

1   the kidnapping charge, there was substantial evidence that Petitioner had the requisite intent to

2   commit rape. Petitioner snatched the victim from a public place and attempted to restrain her in

3   his motor home, which was stocked with sexual "bondage and discipline" instruments. RT at

4   82, 94, 104; Resp. Ex. A at 5. Petitioner aggressively beat the victim in an effort to subdue her

5   resistance. RT at 105-18. And, Petitioner verbally assaulted the victim using language

6   consistent with what one would use when acting out a sexual fantasy about rape. RT at 326. For

7

8   the asportation element of the kidnapping charge, there was substantial evidence that the

9   movement of the victim from the public arena to a secluded private vehicle was substantial in its

10  scope and nature because the new "location provided less likelihood of detection and a greater

11  opportunity to perpetrate additional crimes." Resp. Ex. A at 15. Lastly, the nine pieces of

12  circumstantial evidence recounted by the appellate court – including but not limited to; the

13  Petitioner slamming the victim's head on the counter, floor, and door, choking her numerous

14  times, shocking her numerous times with a stun gun, and verbally assaulting her – demonstrates

15  that the evidence supporting the torture charge was sufficient. Therefore, the prosecutor's

16  incorrect statement, that the jury should not consider the lesser included offenses before the

17  charged crimes, was harmless because ample evidence supported the convictions on the charged

18  crimes. The California Court of Appeal's denial of relief on this claim was not contrary to, or an

19  unreasonable application of, clearly established federal law.

20

21          **ii.     Referring to Facts Outside the Record**

22          To emphasize his argument that Petitioner's intent in attacking the victim must have been

23  sexual, the prosecutor said:

24          This has nothing to do with the facts of this case. Do you know convicted
        sexual felons – parole officers don't let them have vans. . . They know vans can be
25      used to abduct people and commit sex acts. Do you think it's a coincidence he just
        happens to have a vehicle to commit – a room on wheels is what he had.

26  RT at 585. Petitioner argues that referring to these facts outside of the record constituted

27  misconduct that prejudiced his trial. The California Court of Appeals agreed that such

28

24

statements "constituted objectionable misconduct" but concluded that "no prejudice resulted from the brief but improper digression." Resp. Ex. A at 20. The court found that the information did not pertain to the facts of this particular crime. *Id.* Also, the court found that the trial court's subsequent instruction – restricting the jury to base its decision on evidence alone, and clarifying that the attorneys' statements were not evidence – "offset any adverse inference." *Id.*

The prosecutor's statement, prefaced by his acknowledgment that it did not come from the evidence offered, constitutes clear prosecutorial misconduct. However, the California Court of Appeal's determination that no prejudice resulted from the prosecutor's statement was not contrary to or an unreasonable interpretation of established Supreme Court precedent. The appellate court found this otherwise irrelevant statement "accomplished no more than to augment the argument that the camper provided a convenient way to accomplish sex acts." Resp. Ex. A at 20. Also, there was sufficient circumstantial evidence to support the jury's finding that Petitioner intended to rape the victim when he attacked her and pulled her into his motor home. Further, the trial court's recitation of CALJIC 0.50 served to abate any jury confusion over what evidence to consider. RT at 668 ("First, you must determine what facts have been proved in the evidence received in the trial and not from any other source."); RT at 669 ("[S]tatements made by the attorneys during the trial are not evidence. . . .") Therefore, relief is not warranted because no prejudice resulted. *See Lincoln*, 807 F.2d at 811. As the California Court of Appeal's denial of relief on this claim was not contrary to, or an unreasonable application of, clearly established federal law, Petitioner is not entitled to relief on this claim.

### iii.    Likening Lesser Offenses to Plea Bargaining

In his closing argument, the prosecutor referred to the lesser included offenses as a "plea bargaining" request made to the jury by the defense counsel. RT at 562. Petitioner argues that

25

since "[p]lea bargaining is generally looked down upon by the public. . . [the] jury is not likely to welcome a suggestion it engage in that practice." Pet. at 21. Petitioner further argues that referring to the lesser included offenses as plea bargains implied that "the defense attorney knows defendant is guilty of the charged crimes but is looking for [a] better deal." *Id.*

The California Court of Appeals found that even assuming this remark "exceeded the limits of fairness. . . its effect was minimal in context and it therefore did not rise to the level of prosecutorial misconduct." Resp. Ex. A at 21. The appellate court found that the trial court "thoroughly and correctly instructed the jury on its role in considering lesser offenses" and that instruction counterbalanced any error. *Id.*

The Court of Appeal's finding that this statement did not prejudice Petitioner's trial is not contrary to or an unreasonable interpretation of established Supreme Court precedent. The trial court correctly instructed that defendants are presumed innocent, that proof of all crimes must be based on evidence found beyond a reasonable doubt, and that the attorney's statements are not evidence. RT at 678, 672, 669. The California Court of Appeal correctly found the "likelihood of the jury's rejection of the lessers based on an unfavorable view of plea bargaining is not sufficient" basis for granting relief in this case. And further, there was substantial evidence to support the jury's finding that Petitioner was guilty of the crimes charged. The appellate court's denial of relief was reasonable and, therefore, this Court is obligated to affirm it. *See* 28 U.S.C. § 2254(d).

### iv. Asserting Personal Belief in Petitioner's Guilt

When finishing his closing argument, the prosecutor addressed the jury directly as follows: "So I'm asking you to convict him of the charges that he was charged with and not these lessers, because if he was guilty of the lessers, . . . he would have been charged with that." RT at 604. Petitioner argues that this statement impermissibly prejudiced the jury.

The California Court of Appeal found that "[a] suggestion that the prosecutor would not

26

prosecute anyone he did not believe to be guilty is clearly improper. . . ." Resp. Ex. A at 22. But, in distinguishing this case from those where the prosecutor was found to have committed error by expressing a personal belief in the defendant's guilt, the court found that "the reference was brief and mild, and [the prosecutor] did not directly assert a personal belief in [Petitioner's] guilt." *Id.* The court noted the context of the statements and concluded that the prosecutor had only been emphasizing "the inapplicability of the lesser offenses to the facts in evidence" and "the seriousness of [Petitioner's] conduct [as] justif[ying] conviction for the charged crimes." *Id.* Thus, the court found that relief on this claim was not warranted because "[a]ny impropriety was therefore harmless. . . ." *Id.* at 23.

The California Court of Appeal reasonably found any potential misconduct in the prosecutor's remarks to be harmless. The trial court's instructions to the jury included that "[a] defendant in a criminal act is presumed to be innocent until the contrary is proven," and that "[i]f anything concerning the law said by the attorneys in their argument. . . conflicts with [the judge's] instructions on the law, [then the jury] must follow [the judge's] instructions." RT at 678, 668. Moreover, there was more than sufficient evidence to support the jury's finding of guilt of the crimes charged. Therefore, the prosecutor's comments did not affect the verdict against Petitioner.

Given the four claimed instances of misconduct, this Court must consider whether Petitioner has established a due process violation based on a pattern of misconduct. *See Lincoln*, 807 F.2d at 811. The sheer number of instances of misconduct in this case may be sufficient to establish a pattern of misconduct. *Id.* at 809 (the prosecutor's four arguably improper comments during his thirty minute rebuttal argument were clearly more egregious than the permitted single, isolated incident of misconduct). However, as determined by the Ninth Circuit in *Lincoln* and as will be found in the instant case, relief can not be granted despite the prosecutor's ongoing pattern of misconduct until there is a showing of actual prejudice to that defendant. *See id.* at

27

811. Therefore, relief cannot be granted where, as here, no prejudice has been established. *See id.* The California Court of Appeal's denial of relief on this claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

## V.   Ineffective Assistance of Trial Counsel

Petitioner makes numerous distinct claims of ineffective assistance of trial counsel. In particular, he asserts that defense counsel Thomas Orvis: failed to object to multiple instances of prosecutorial misconduct and to the imposition of a restitution fine; failed to investigate, present, and argue favorable evidence that was readily available to the defense; failed to timely submit critical motions and to adequately prepare for trial; failed to provide expert witness testimony; failed to order an adequate psychological examination of Petitioner; failed to present favorable testimony from available witnesses; failed to adequately interview and cross-examine prosecution witnesses; refused to allow Petitioner to exercise his right to testify; inappropriately commented on Petitioner's guilt; failed to present a self-defense argument to the jury; and failed to effectively explore and negotiate a plea bargain. Pet. at 23-54. Petitioner claims that trial counsel's performance fell below reasonable standards and argues that the cumulative effect of counsel's errors prejudiced him from receiving a fair trial. Pet. at 55-57.

### A.   Legal Standard

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e.,

28

that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish deficient performance under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

## B.   Analysis

### I.   Failure to Object to Prosecutorial Misconduct

Petitioner first claims that trial counsel's failure to object to multiple instances of prosecutorial misconduct deprived him of his right to effective assistance of counsel at trial. Pet. at 24. The Court of Appeal rejected this claim on the merits, finding that Petitioner was not prejudiced by the prosecutor's alleged errors and thus that trial counsel was not constitutionally ineffective for failing to object. Resp. Ex. A at 19-23. This Court has likewise concluded that the prosecutor's allegedly impermissible comments did not rise to the level of prosecutorial misconduct and/or were not prejudicial to Petitioner. *See supra*, section IV. Counsel's failure to object to these alleged instances of impropriety thus did not constitute ineffective assistance, and habeas relief is denied for this claim.

### ii.   Failure to Object to Restitution Fine

Petitioner also contends that Orvis failed to notify him about the imposition of a $10,000 restitution fine prior to sentencing and that he failed to contest the amount of the fine based on Petitioner's inability to pay. Pet. at 27.

29

1   As an initial matter, Petitioner's claim that he had no notice of the fine is without merit.
2   The probation report clearly recommended the $10,000 fine imposed by the judge. CT 678. In
3   response to the report, trial counsel submitted a thorough, written rebuttal challenging only the
4   prison component of the sentence. CT 650. Both the report and the rebuttal are part of the
5   record, and Petitioner has not established that he was unaware of the possibility of a fine leading
6   up to and during sentencing. His claim that trial counsel failed to timely provide him with a
7   copy of the probation report and did not discuss the matter of a fine with him does not prove he
8   had no notice of the fine. Pet. at 27. Notably, Petitioner spoke at length during the sentencing
9   hearing but never addressed the fine issue, nor did he express surprise when the court imposed
10  the sentence. *See* RT 794-99, 804.

12      Regarding counsel's alleged failure to contest the fine, the Santa Clara County Superior
13  Court found that the trial court did not abuse its discretion in imposing the $10,000 fine pursuant
14  to the factors listed in Penal Code § 1202.4. Pet. Ex. R at 9. The record supports the Superior
15  Court's finding. The trial court imposed the fine pursuant to the formula set out in § 1202.4(b)
16  and as recommended by the probation officer. CT 678; RT 804. Although section 1202.4(d)
17  does require the sentencing court to take into account relevant factors including the defendant's
18  ability to pay, there is no evidence that Petitioner did not have the financial means or earning
19  capacity that would have warranted a lesser fine. Indeed, by Petitioner's own account during
20  sentencing, he was a designer by profession, had successfully run his own company for seven
21  years, and had never been on social service or unemployment. RT 796. Leading up to the
22  incident, Petitioner worked at a "high-end" remodeling company, and his supervisor testified on
23  his behalf at trial. RT 375. She stated that Petitioner was a skillful, respected carpenter and
24  noted that one of the projects he worked on received a design award. RT 374-76. In light of
25  Petitioner's established technical skills and lasting repute among his co-workers, he has failed to
26  prove that he lacked resources to pay the fine or that Orvis had reason to know of his tenuous

30

1  financial situation. Orvis's failure to object did not constitute deficient performance under

2  *Strickland*, and the Superior Court's rejection of Petitioner's claim was reasonable.

3              **iii.    Failure to Present and Argue Favorable Evidence**

4          Petitioner argues that defense counsel improperly failed to investigate and argue

5  favorable evidence available to the defense. The Superior Court, correctly applying the

6  *Strickland* standard, rejected Petitioner's claims that counsel's failure to present certain evidence

7  fell below an objective standard of reasonableness or prejudiced Petitioner at trial. Pet. Ex. R. at

8  5-8. The Court addresses each item of evidence in turn.

9

10             **a.    Photograph of Petitioner's Hands and Fingernail Scrapings**

11         Petitioner first claims that trial counsel should have presented a photograph of

12  Petitioner's hands as well as fingernail scrapings taken by the police, which allegedly would

13  have shown that he could not have caused the scratches on the victim's face. Pet. at 29.

14         The fingernail scrapings and photograph of Petitioner's hands would have done little to

15  negate the other overwhelming evidence of physical abuse; thus, Petitioner was not prejudiced

16  by counsel's omission of this evidence. *See Strickland*, 466 U.S. at 694. According to testimony

17  by the victim, Petitioner slammed her head repeatedly against the counter top, floor and side-

18  door of the RV, applied a stun gun to her body, and strangled her with his hands. RT 105-118.

19  Standing-Elk testified to seeing blood all over the victim's face, RT 348, and she reported severe

20  bruising all over her body, RT 126. In light of this evidence, proof that Petitioner had not

21  scratched the victim with his fingernails would have been irrelevant to his defense. Defense

22  counsel's failure to present the evidence was in no way prejudicial to Petitioner at trial, and the

23  superior court was reasonable in so concluding. *See* Pet. Ex. R at 6.

24

25             **b.    Petitioner's keys**

26         Petitioner claims that the fact that his keys were found in his front pocket would have

27  shown that he intended to enter Safeway to purchase groceries, negating any criminal intent on

28

31

his part leading up to the incident. Pet. at 30. He also argues that the evidence would have impeached Standing-Elk's testimony that there was a struggle over the ignition key. Pet. at 30.

Defense counsel's failure to present this evidence did not constitute ineffective assistance because Petitioner was not prejudiced by the omission. As the Superior Court noted, whether or not Petitioner intended to enter Safeway at some point was irrelevant to whether he ultimately intended to rape and torture the victim. Pet. Ex. R. at 7. The impeachment of Standing-Elk's testimony on this point would not have helped Petitioner's defense in light of the damaging impeachment evidence already before the jury: Orvis cross-examined Standing-Elk about recently pleading guilty to felony assault against his wife, as well as an earlier criminal conviction for possession of an illegal substance. RT 356-57. Petitioner has not established that there was a reasonable probability that, but for counsel's failure to further impeach Standing-Elk with respect to the altercation over the keys, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

### c.    Petitioner's wallet

Petitioner claims that trial counsel should have presented evidence that his wallet was located in the back of the RV. Pet. at 30. He argues that this would have explained why he chose to exit the RV through the side door, and it would have refuted the prosecution's theory that he went to Safeway "to stalk for females." Pet. at 30.

The Superior Court was reasonable in concluding that the circumstantial evidence supported the jury's finding that Petitioner intended to rape and torture the victim, and that Petitioner was not prejudiced by counsel's omission of this evidence. Pet. Ex. R. at 7. Like the location of Petitioner's keys, the whereabouts of Petitioner's wallet was not relevant to a determination of his intent during the day in question. There are multiple, neutral explanations for why Petitioner had his wallet with him, and Petitioner has failed to show how the wallet's location alone proves he had no intention to "stalk" women. Given the strong circumstantial

1   evidence of guilt, it is unlikely that the outcome of the trial would have been different if the

2   evidence regarding his wallet was presented to the jury. Having thus failed to show prejudice,

3   Petitioner's claim fails.

4
### d.   Maps to The Forum and Nude Beaches

5
6   Petitioner claims defense counsel should have introduced into evidence certain maps to

7   the Forum and nude beaches that were found in the RV. Pet. at 30. This evidence, Petitioner

8   asserts, would have given credibility to his girlfriend's testimony that they "only" planned to

9   spend the weekend celebrating their anniversary together at the club and surrounding beaches.

10  Pet. at 30.

11  Petitioner is correct that the maps corroborated the testimony of his girlfriend, Patricia

12  Ramirez, that they had a pre-scheduled plan to go to the Forum together for the holiday

13  weekend. *See* RT 495-97. However, Petitioner's argument fails because he cannot establish that

14  these maps would have proven that they had "only" planned on pursuing those activities.

15  Whether or not Petitioner intended to go to the Forum with his girlfriend at some point, it was

16  entirely possible that he had other intentions as well. Evidence that Petitioner and Ramirez

17  planned a weekend together engaging in sexual activities does not mean that an abduction was

18  impossible. RT 664. As the prosecutor brought out while cross-examining Ramirez, she and

19  Petitioner had previously engaged in sexual activity with a third person, and had discussed

20  wanting to involve another female. RT 505-06. The admission of these maps would not have

21  precluded a finding that Petitioner committed the crimes he was convicted of on the night they

22  were scheduled to depart. Counsel's failure to offer this questionable evidence did not constitute

23  deficient performance falling below an "objective standard of reasonableness." *See Strickland*,

24  466 U.S. at 687-88.

25
26
### e.   Victim's Medical Records

27  Petitioner asserts that counsel should have offered into evidence the victim's medical

28
33

report from her emergency room visit following the incident. Pet. at 32. He contends that at the preliminary hearing, defense counsel had expressed the grave importance of the medical report with respect to the issue of great bodily injury, but he failed to properly conduct a pretrial investigation to obtain the records. Pet. at 32. Counsel's subsequent failure to present the evidence at trial, despite having subpoenaed the records beforehand, allegedly fell below a reasonable standard of diligence and prejudiced Petitioner at trial. Pet. at 33.

Contrary to Petitioner's claim that counsel failed to conduct a pretrial investigation to obtain the medical records, Orvis did issue a subpoena to obtain the records and received them in February 1998, almost two months before trial. CT 269, 278; Pet. Ex. J. Orvis had initially attempted to obtain the records from the prosecution's investigating officer prior to the preliminary hearing, but was informed he had to subpoena them from the hospital instead. CT 5. This does not reflect a failure to investigate that could support an ineffective assistance claim. *See Turner v. Duncan*, 158 F.3d 449, 456-57 (9th Cir. 1998) (counsel failed to: (a) review prior attorney's well-developed case file or conduct any investigation; (b) interview any government witnesses; (c) arrange psychiatric examination; and (d) adequately consult with and prepare his client to testify).

Furthermore, Petitioner has not shown specifically how the medical records were favorable, only that counsel had discussed their importance at the preliminary hearing stage. This does not support his argument that failure to seek admission of the records at trial constitutes ineffective assistance. Counsel had not yet seen the records prior to the preliminary hearing, so he could only speculate at that point whether they would negate the great bodily injury charges or not. CT 5. Counsel explained that he wanted to see the medical records because "it was difficult to tell from the police report how serious the injuries were." CT 5. This was not an affirmative statement or promise that counsel would introduce the records after reviewing them and assessing their usefulness to Petitioner's defense.

34

1  A review of the medical records shows that they were not in fact useful to Petitioner's

2  defense. On the contrary, Dr. Belom's typed report details the victim's description of the

3  altercation and directly supports her testimony at trial: she was "pulled" into the RV while taking

4  groceries to her car, she "yelled, screamed and scuffled with her assailant," was "apparently

5  handcuffed at one point, and was "struck" in the face. Pet. Ex. J, Medical Report, p. 1. The

6  doctor noted that the victim had red areas and diffuse tenderness on her abdomen, where she was

7  "obviously struck." *Id.* at 2. In addition, notations on an emergency room form reflect that the

8  "stranger . . . used a stun gun and handcuffs to beat her with." Pet. Ex. J, Triage Sheet. If

9

10  anything, these statements within the medical records would have corroborated the prosecution's

11  evidence and provided a reasonable basis on which to exclude them at trial. Counsel's decision

12  not to enter them into evidence was tactically justified, *see Alcala v. Woodford*, 334 F.3d 862,

13  870-71 (9th Cir. 2003), and did not constitute deficient performance.

14  **f.  Photos and Measurements of RV**

15  Petitioner claims that counsel denied his repeated requests to present evidence concerning

16  the measurements and dimensions of various locations in the RV. Pet. at 33. This evidence, he

17  argues, would have refuted the victim's testimony about how her injuries were caused. Pet. at

18  34. Furthermore, photographs of different angles and obstructed views in the RV allegedly

19  would have provided an alternative to the prosecution's theory that the victim had not seen

20  Standing-Elk because she had lost consciousness. Pet. at 34.

21  With respect to refuting the victim's testimony, Plaintiff again attaches undue

22

23  significance to determining the exact cause of the victim's injuries. In light of the substantial

24  evidence of abuse – including strangulation, use of a stun gun, and repeated blows against the

25  RV counter and floor – there is no reasonable probability that, if counsel had further established

26  which injuries were caused by which RV surfaces, the outcome of the trial would have been

27  different. *See Strickland*, 466 U.S. at 694. As the Superior Court concluded, Petitioner would

28

35

1  have been convicted anyway even if the photos were admitted into evidence, and he was not
2  prejudiced by counsel's failure present the evidence at trial. Pet. Ex. R. at 8.

3      Petitioner's argument that evidence should have been admitted to show the victim had not
4  been unconscious but only obstructed from seeing Standing-Elk also fails. This theory ignores
5  the fact that Standing-Elk spoke to Petitioner during the altercation; that the victim could not see
6  Standing-Elk would not explain why she did not hear him. RT 335, 338, 343-45. Furthermore,
7  the victim herself testified that she believed she had lost consciousness. RT 110, 119. In any
8  event, defense counsel brought out compelling evidence on cross-examination of Standing-Elk
9  that Standing-Elk had seen the victim moving continually, at all times he was in the RV. RT
10 355. This testimony was effective in refuting the prosecution's theory that the victim was
11 unconscious when Standing-Elk was present in the camper. Counsel's failure to introduce
12 additional, photographic evidence on this point was neither deficient performance nor prejudicial
13 to Petitioner's defense.
14

15          **g.  Petitioner's Blood Samples**

16      Petitioner argues that Orvis should have investigated and presented blood evidence to
17 show that he was intoxicated and under the influence of a controlled substance when the incident
18 occurred. Pet. at 36. Petitioner claims a blood sample was taken by the police after the incident,
19 but Orvis never attempted to test the sample despite Petitioner's requests. Pet. at 36. The
20 Superior Court concluded that there is no evidence showing that Petitioner was intoxicated, and,
21 "[i]n fact, the record reveals the contrary." Pet. Ex. R. at 7.
22

23      Counsel's failure to investigate Petitioner's blood sample was not deficient performance.
24 As the Superior Court concluded, there is no evidence from the witnesses who saw or spoke to
25 Petitioner on the day in question that he had been drinking prior to the incident. The owner of
26 Leathermaster testified that he noticed nothing unusual about Petitioner's demeanor when he
27 came into the store, except that he was "a little shy" asking about "Anal Ease." RT 308.
28

36

1  Petitioner's best friend David Jasak, who had stopped by Petitioner's house the afternoon of the
2  incident, similarly testified that he observed nothing unusual about Petitioner's demeanor at that
3  time. RT 266. Petitioner was simply preparing for his camping trip and appeared excited about
4  his vacation. RT 266. Petitioner's girlfriend Ramirez testified to the same effect, indicating that
5  she had spoken to Petitioner during the day, and he told her that he was busily making
6
7  preparations for their trip. RT 498. Nowhere in the witnesses' testimony is there any suggestion
8  that Petitioner was drinking during the day in question, and there was no reason to pursue a
9  blood test based on these facts. Moreover, the defense position throughout trial was that this
10 was a relatively minor altercation in the parking lot, and that the severe torture and great bodily
11 injury charges were unsupported by the evidence of injury suffered by the victim. Petitioner's
12 state of intoxication would not have furthered this defense theory, or, for that matter, the self-
13 defense theory that Petitioner now asserts should have been presented. *See infra*, section V.B.x.
14 Counsel's decision not to pursue this avenue was not objectively unreasonable. *See Strickland*,
15 466 U.S. at 687-88.

16                            iv.    **Failure to Submit Motions and Properly Prepare for Defense**

17        Petitioner argues that counsel was ineffective in not filing a timely motion for
18 continuance prior to the preliminary hearing. Pet. at 37. He asserts that the motion was
19 necessary to allow counsel time to obtain the emergency room medical report written by Dr.
20 Belom the night of the incident. Pet. at 37. Petitioner further claims that counsel failed to seek a
21 continuance prior to the evidentiary hearing in order to investigate Standing-Elk's criminal
22 history and plea bargain agreements, as well as to pursue an expert witness to refute Dr. Ozoa's
23 testimony. Pet. at 38.
24

25        The Court previously concluded that counsel's failure to obtain Dr. Belom's report prior
26 to the preliminary did not constitute deficient performance. *See supra*, section V.B.iii.e. And, as
27 discussed below, counsel's alleged failure to further investigate Standing-Elk's criminal history,
28

                                          37

1  *see infra*, section V.B.viii, and to pursue an expert witness to refute Dr. Ozoa, *see infra*, section
2  V.B.v, was not deficient performance either. Accordingly, counsel's failure to file a motion for
3  continuance for the purpose of accomplishing these tasks did not fall below an objective
4  standard of reasonableness, *see Strickland*, 466 U.S. at 687-88, and Petitioner's ineffective
5  assistance claim fails.

### v.  Failure to Provide Expert Testimony

Petitioner claims that counsel should have sought an expert witness to testify against the
prosecution's medical expert, Dr. Ozoa. Pet. at 40. This expert testimony was crucial, he
argues, to refute the issue of severe strangulation, asphyxiation, or loss of consciousness. Pet. at
40. Petitioner further argues that counsel should have called Dr. Belom, the physician who
examined the victim during her emergency room visit after the altercation, because he allegedly
would have testified that her injuries were not severe. Pet. at 41.

Expert testimony is necessary when lay persons are unable to make an informed judgment
without the benefit of such testimony. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir.
1999). Counsel must conduct an investigation sufficient to allow a determination of what sort of
experts need to be consulted. *See id.* at 1226. But where the evidence does not warrant it, the
failure to call an expert does not amount to ineffective assistance of counsel. *See Wilson v.
Henry*, 185 F.3d 986, 990 (9th Cir. 1999). And even if counsel's failure to consult and present
expert testimony was unreasonable, petitioner must show that such failure prejudiced his case.
*See Richter v. Hickman*, 521 F.3rd 1222, 1230-32 (9th Cir. 2008).

Petitioner has not established that the evidence in this case warranted a second medical
expert. Here, the key question for the defense was not what the physical effects of strangulation
are, but rather, whether the photographs of the victim showed that she suffered those effects. Dr.
Ozoa answered the former question, explaining that "petechiae" or small hemorrhages on the
eyeball are typical of choking, while more diffuse hemorrhaging, which was apparent in the

38

photographs, can be the result of multiple causes. RT 158, 162. Orvis appropriately sought to raise a reasonable doubt as to the second question, by establishing on cross-examination that the diffuse hemorrhaging in the victim's eyes was not petechiae and could have had a number of causes, including coughing or sneezing. RT 160-162. Dr. Ozoa's direct testimony, combined with Orvis' cross-examination, was sufficient to allow the jury to make an informed decision on whether the victim had in fact suffered strangulation. *See Caro*, 165 F.3d at 1227. A second medical opinion on the physical effects of strangulation was unwarranted, *see Wilson*, 185 F.3d at 990, and counsel's failure to seek such an expert was not unreasonable.

Defense counsel was similarly not deficient in failing to call Dr. Belom as an expert witness. Petitioner has failed to establish that the physician's testimony in regard to the victim's injuries would necessarily have been favorable to his defense. As discussed in connection with counsel's decision not to enter the victim's medical records into evidence, there is substantial factual support within Dr. Belom's medical report for the prosecution's version of events. *See* Pet. Ex. J, Medical Report, ¶. 1-2. Counsel's decision not to call Dr. Belom as an expert witness was thus reasonable from a tactical standpoint.

As a final matter, Petitioner's claim that counsel was ineffective in failing to pursue certain experts to challenge the severity of the victim's injuries ignores the fact that Orvis did present effective expert testimony on that front. Dr. Stratbucker, an expert in stun guns, compellingly refuted the prosecution's evidence about the injury-causing potential of stun guns. RT 463-68. Orvis's performance in choosing expert witnesses was reasonable and well within the standard of professional conduct.

### vi. Failure to Obtain Psychological Examination of Petitioner

Petitioner claims that counsel failed to provide a timely and adequate psychological examination for the purpose of establishing his lack of intent to rape or torture the victim. Pet. at 41. He states that he was the victim of a violent crime in 1991 that resulted in severe injury to

39

1   his jaw and caused lasting emotional damage. Pet. at 41.

2       The failure to investigate a mental health defense is not deficient unless the petitioner can
3   show that counsel had reason to know that petitioner's mental health might be impaired.
4   *Hoffman v. Arave*, 455 F.3d 926, 932 (9th Cir. 2006), *judgment vacated in part on other grounds*
5   *by Arave v. Hoffman*, 128 S. Ct. 749 (2008) (per curiam). Defense counsel had no such reason
6   to know Petitioner's mental health was damaged by the incident in 1991. Orvis did elicit
7   testimony from Petitioner's mother showing that Petitioner suffered a "very, very serious" injury
8   that "totally destroyed his jaw." RT 524. She stated that Petitioner was especially careful about
9   getting hit in the jaw, as it was replaced by "little wires" and could never be repaired if
10  dislocated again. RT 524. This testimony effectively established that Petitioner had a physical
11  sensitivity toward permanent jaw injury. But Petitioner has not established that there is a basis
12  to conclude his mental health was at issue in this incident, and counsel's decision not to pursue
13  such evidence was reasonable. *See Hoffman*, 455 F.3d at 932; *see, e.g., Wilson*, 185 F.3d at 990
14  (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the
15  evidence does not raise the possibility of a strong mental state defense).
16
17              vii.    **Failure to Provide Eyewitness Testimony**

18      Petitioner claims that counsel improperly failed to call Elizabeth Olivas as a witness, who
19  was present with Standing-Elk in the Safeway parking lot when the incident took place. Pet. at
20  42. Petitioner argues that Olivas' comments to the private investigator regarding Standing-Elk's
21  propensity to lie should have been presented to impeach Standing-Elk. Pet. at 42.
22
23      While Olivas' statements were potentially favorable for impeachment purposes, Standing-
24  Elk's criminal history was already elicited at trial, RT 349-60, and Petitioner has not shown how
25  general commentary on Standing-Elk's character would have beneficially affected the outcome
26  of the trial. *See Strickland*, 466 U.S. at 694. Nor has Petitioner established that Olivas was
27  likely to or willing to refute Standing-Elk's testimony about the incident itself. The investigative
28

40

1  report contains no evidence about what Olivas remembered about the incident, except that the
2  police asked her questions and "she kept saying yes to everything they asked." Pet. Ex. N at 2.
3  Finally, the investigative report shows that Olivas herself had a criminal background that would
4  be impeachable by the prosecution. She admitted she spent time in jail "for the bad things [she]
5  used to do." *Id.* at 1. Considering the impeachment evidence against Standing-Elk already
6  before the jury, the lack of substantive information concerning Olivas' memory of the actual
7  incident, and her own impeachable criminal history, Petitioner has failed to show that counsel's
8  failure to call Olivas as a witness was prejudicial to his defense.
9

10  Petitioner also claims that counsel failed to call Barry Devita, who was present at the
11  crime scene and filed a witness statement in the Santa Clara County police department. Pet. at
12  43. Petitioner asserts that the witness statement shows Devita's testimony would have supported
13  his version of events at trial. Pet. at 43.

14  Again, Petitioner has failed to establish that Devita's testimony would have helped his
15  defense. Devita's witness statement lends no support to Petitioner's version of events and in fact
16  corroborates the testimony of other prosecution witnesses, including Standing-Elk. Devita stated
17  that the "camper was rocking . . . You could clearly hear [the victim] screaming . . . We 3 banged
18  on the windows of the camper telling him to let her go . . . Suspect told her to shut up." Pet. Ex.
19  O at 1. This directly correlates with Standing-Elk's testimony that he heard constant bursts of
20  screams and observed the motor home shaking sideways violently. RT 334-35. It also confirms
21  the victim's testimony that Petitioner told her to "shut up, bitch." RT 105. In addition, Devita
22  described Petitioner's repeated attempts to resist arrest: "Both officers shouted at the suspect to
23  get out of the camper and get down on the ground – to no avail . . . [T]he suspect continued to
24  resist – refusing to follow their instructions." Pet. Ex. O at 3. Testimony on these lines would
25  not have corroborated Petitioner's story that he had only been trying to lock up his camper, not
26  resist arrest. *See* Pet. at 43. Counsel's failure to call this potentially adverse witness did not
27
28

41

1 prejudice Petitioner at trial.

2
### viii. Failure to Cross-Examine and Interview Prosecution Witnesses

3
4
5
6
7
8
9
10
11
12
Petitioner first contends that trial counsel did not adequately cross-examine prosecution witness Dorothy Fischer, an elderly woman who observed the events leading up to the altercation. Pet. at 44. Counsel allegedly should have questioned Fischer about her poor eyesight and her position in relation to the RV when the altercation occurred. Pet. at 44. Petitioner further argues that counsel failed to explore an inconsistency between Fischer's story and the victim's. Pet. at 44. Whereas the victim said Petitioner had walked by her and then turned around before grabbing her, Fischer said he grabbed her immediately after opening the camper door. Pet. at 44. Petitioner asserts that the victim made up her version to make it look like the altercation was not an accident. Pet. at 44.

13
14
15
16
17
18
19
20
21
22
23
24
Counsel's cross-examination of Fischer was not deficient. Orvis questioned Fischer about her eyesight and asked her to estimate how far she was standing from the RV when she observed the altercation. RT 89-90. He brought out that she could not see the full bodies of the victim and Petitioner from her vantage point, given the angle of the RV door and her position in the parking lot. RT 89-93. This questioning adequately addressed the issue of Fischer's eyesight and viewpoint while the altercation was taking place. Further testimony on this topic would not have helped Petitioner's case, particularly in light of the fact that other witnesses corroborated Fischer's testimony. Petitioner's contention that counsel should have explored the inconsistency between Fischer's account and the victim's is also without merit. Whether Petitioner initially walked by the victim before turning around to grab her was not relevant to the issue of his intent and the severity of the injuries she sustained.

25
26
27
28
Second, Petitioner asserts that counsel failed to interview the key prosecution witnesses, Fischer, Standing-Elk, and the victim, prior to the preliminary hearing and trial. Pet. at 45. He claims that counsel's failure to do so deprived him of the opportunity to "weed out" weaknesses

42

1    or potential grounds for impeachment in the prosecution's case. Pet. at 45.

2        The duty to investigate and prepare a defense does not require that every conceivable
3    witness be interviewed. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). A claim of
4    failure to interview a witness cannot establish ineffective assistance when the person's account is
5    otherwise fairly known to defense counsel. *Eggleston v. United States*, 798 F.2d 374, 376 (9th
6    Cir. 1986). When the record shows that the lawyer was well-informed and the defendant fails to
7    state what additional information would be gained by the discovery he now claims was
8    necessary, an ineffective assistance claim fails. *Id.* A defendant's mere speculation that a
9    witness might have given helpful information if interviewed is not enough to establish
10   ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d
11   1150 (9th Cir. 2001).

12

13       The record shows that defense counsel was well-informed of the prosecution witnesses'
14   accounts, and Petitioner has failed to show that additional information would have been gained
15   by interviewing them prior to the preliminary hearing or trial. *See Eggleston*, 798 F.2d at 376.
16   As discussed above, Orvis adequately cross-examined Fischer on the issue of her physical ability
17   to see the altercation based on her eyesight and vantage point. The minor inconsistencies
18   between Fischer's account and the victim's would not have helped Petitioner's case. Similarly, a
19   prior interview with Standing-Elk regarding his criminal background was unnecessary, as
20   defense counsel was aware of and properly established Standing-Elk's criminal history during
21   cross-examination. RT 356-57. Petitioner's allegation about an agreement between Standing-
22   Elk and the District Attorney's office is pure speculation with no support in the record. With
23   respect to the victim, Petitioner has failed to show that a prior interview would have given
24   helpful or additional information that would have contradicted her testimony at trial. Having
25   failed to establish, beyond pure speculation, what information the prosecution witnesses could
26   have provided during an interview, Petitioner's ineffective assistance of counsel claim fails. *See*
27

28

                                        43

*Bragg*, 242 F.3d at 1087.

Third, Petitioner contends that counsel failed to investigate the sentencing and conviction record of Standing-Elk, and to interview the assistant district attorney in charge of the criminal case against Standing-Elk. Pet. at 47. The Superior Court rejected these claims, holding that Petitioner "failed to allege that but for counsel's failure to interview the prosecutor and the victim, the outcome of his case would have been different." Pet. Ex. R at 10.

As noted above, there is no basis for Petitioner's allegation that Standing-Elk was offered a plea bargain in exchange for his testimony. Petitioner's mere speculation about what could have been gained from an investigation of Standing-Elk's criminal record or an interview with his prosecuting attorney does not support his ineffective assistance of counsel claim. *See Bragg*, 242 F.3d at 1087. The Superior Court's rejection of Petitioner's claim was reasonable, and habeas relief is denied.

### ix. Denial of Petitioner's Right to Testify

Petitioner contends that trial counsel refused to let him testify on his own behalf despite the fact that he was the only one who would have been able to confront or refute the prosecution's version of events. Pet. at 48. He claims that counsel used "scare tactics" to intimidate him out of testifying and had no tactical or strategic reason for denying Petitioner his right to testify. Pet. at 49-50.

On July 31, 1998, Petitioner moved for a new trial on the basis of counsel's alleged refusal to allow him to testify. Pet. Ex. G. The court denied the motion, finding, "based upon what I have heard . . . the attorney did not refuse to allow his Defendant to testify as that right as [sic] set forth in the law." Pet. Ex. G at 11. This was an express factual finding by the trial court that cannot be disturbed by this Court unless Petitioner shows clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). Petitioner has failed to meet this burden. Counsel evidently believed it was tactically inappropriate for Petitioner to take the stand. At the hearing,

44

1   Orvis stated he "was adamant [Petitioner] should not testify," and said he told Petitioner why at

2   "every opportunity." Pet. Ex. G at 7. The trial court then asked whether Orvis believed

3   Defendant decided not to testify based on counsel's advice. *Id.* Orvis said that was his

4   understanding. *Id.* Counsel's strong opinion advising Petitioner against taking the stand, and

5   Petitioner's apparent decision to follow counsel's advice, was not a denial of Petitioner's right to

6   testify. Petitioner's disagreement with counsel's trial tactics on this issue does not constitute a

7   denial of effective assistance. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

8

9                 **x.   Comments on Petitioner's Guilt and Failure to Argue Self-Defense**

10      Petitioner asserts that trial counsel was ineffective in not arguing a self-defense theory

11  and making inappropriate comments about Petitioner's guilt. Pet. at 52. Orvis specifically told

12  the jury in both his opening and closing statements that he would not be presenting any evidence

13  of self-defense. RT 63-64, 615-16. Petitioner claims he never authorized these comments and

14  asserts that the self-defense argument would have been a favorable strategy. Pet. at 53.

15      Defense counsel's statements regarding self-defense and his admissions that Petitioner

16  did commit assault were consistent with his overall trial strategy. Counsel explained this

17  strategy in his opening statement:

18      [A]lthough you've heard the District Attorney indicate that Mr. Victory may have told
        some friends of his that this was self defense, please be assured that in this courtroom the
19      Defendant will not be presenting any evidence of self-defense. Mr. Victory assaulted this
        woman and he beat this woman. It was horrible, absolutely horrible, but unfortunately
20      that's not why we are here. We're here because Mike is charged with torturing this
        woman, here because he's charged with intent in assaulting her, with intent to rape her.
21      We're here because he's charged with . . . kidnapping with intent to rape or perform some
        other type of sexual offense on her. And he's here today because he's charged with
22      assault with intent or with force likely to cause great bodily injury. All four of those
        charges he denies. He has asserted his Constitutional rights and it is to those issues which
23      you will have to make a very difficult decision. . . . [W]e expect the evidence to show . . .
        that the District Attorney has not proved their case beyond a reasonable doubt and that
24      you must acquit him of those four charges I just mentioned. But that is not to say you
        should not find him guilty of some other charge. . . . [B]elieve me, at the opening of this
25      case, we expect Mr. Victory to be found guilty of one or more offenses, serious offenses,
26      but not the offenses that have just been read to you."

27  RT 63-64. Later, in his closing statement, Orvis described the approach as "damage control."

28

                                               45

1   RT 616. To be sure, Orvis never stated to the jury that Petitioner was "guilty." On the contrary,
2   he emphasized the presumption of innocence in his closing statement: "I would also suggest to
3   you that at this point in time [the Defendant] is innocent and he remains innocent until you . . .
4   have weighed the evidence and made your decision." RT 608-09.
5
6       A trial attorney has wide discretion in making tactical decisions, including abandoning
7   unsupported defenses. *See Correll v. Stewart*, 137 F.3d 1404, 1411-12 (9th Cir. 1998). There
8   was substantial evidence of assault in this case, including the victim's multiple injuries, the
9   eyewitness testimony describing Petitioner's anger and aggressiveness, the relative sizes of the
10  Petitioner and victim, the taser gun, and Petitioner's attempt to resist arrest. Counsel had to take
11  into account the likelihood of damaging Petitioner's credibility with the jury if he were to
12  suggest that the victim started the altercation and that her injuries were simply the result of
13  Petitioner's attempt to protect himself. It was reasonable for defense counsel to concede assault
14  and instead focus the jury's attention on the issues of sexual intent and torture, where the
15  evidence was less direct and the penalties were more severe. While Petitioner may not agree
16  with Orvis's strategy, a difference of opinion as to trial tactics does not constitute denial of
17  effective assistance, *see Mayo*, 646 F.2d at 375, and tactical decisions are not ineffective
18  assistance simply because in retrospect other tactics were available. *See Bashor v. Risley*, 730
19  F.2d 1228, 1241 (9th Cir. 1984). Plaintiff is denied habeas relief for this claim..
20

### xi.   Failure to Pursue a Plea Bargain

21
22      Petitioner claims that trial counsel did not diligently explore or negotiate a plea bargain.
23  Pet. at 53. He argues that given his reputable employment history and lack of a criminal record,
24  he never would have pled to the "overzealous" charges pursued by the District Attorney. Pet. at
25  53. The Superior Court rejected this claim, finding that "Petitioner . . . failed to sustain his
26  burden of alleging that the People were willing to settle the case, or that the offered plea bargain,
27  if any, would have been approved by the court." Pet. Ex. R at 9.
28

46

1   The Superior Court was reasonable in concluding that Petitioner failed to show the
2   prosecution had any intention of offering a plea bargain. One of the grounds defense counsel
3   noted in his February 1998 motion for continuance was that the prosecutor "refused to discuss
4   any disposition less than life in prison." CT 267. Nor is there evidence that Petitioner would
5   have accepted a plea bargain if offered one. Indeed, petitioner continues to emphatically assert
6   his innocence as to any criminal conduct, and, as discussed above, he faults defense counsel for
7   conceding the assault charge. In light of Petitioner's unwillingness to concede assault and the
8   prosecutor's refusal to discuss anything less than life in prison, Petitioner has failed to establish
9   there was any possibility of settlement. Habeas relief is accordingly denied for this claim.

11      In sum, Petitioner has failed to establish ineffective assistance of trial counsel as to any of
12   his claims. Because this Court concludes that no deficiencies in counsel's representation or
13   prejudice occurred, Petitioner's cumulative-effect argument also fails. *See Harris v. Wood*, 64
14   F.3d 1432, 1438 (9th Cir. 1995) ("'[P]rejudice may result from the cumulative impact of
15   multiple deficiencies.'") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en
16   banc)).

17  **VI.    Ineffective Assistance of Appellate Counsel**

18      Petitioner claims that he received ineffective assistance of appellate counsel by counsel's
19   failure to research, raise, and preserve meritorious claims on direct appeal. Pet. at 57. The Due
20   Process Clause guarantees a criminal defendant the effective assistance of counsel on his first
21   appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-394 (1985). Claims of ineffective
22   assistance of appellate counsel are reviewed according to the standard set out in *Strickland v.*
23   *Washington*, 466 U.S. 668 (1984). *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). A
24   defendant therefore must show that counsel's advice fell below an objective standard of
25   reasonableness and that there is a reasonable probability that, but for counsel's unprofessional
26   errors, he would have prevailed on appeal. *Id.* at 1434 (citing *Strickland*, 466 U.S. at 688, 694;

28                                                    47

1   *United States v. Birtle*, 792 F.2d 846, 849 (9th Cir. 1986)). Appellate counsel does not have a

2   constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v.*

3   *Barnes*, 463 U.S. 745, 751-54 (1983); *Miller*, 882 F.2d at 1434 n.10.

4        Petitioner has failed to show that his appellate counsel was ineffective. The issues

5   Petitioner claims should have been addressed on direct appeal are identical to those raised in this

6   habeas action, namely, ineffective assistance of trial counsel and prosecutorial misconduct. *See*

7   Pet. at 57-61. The Court has rejected these claims after a thorough review of the record.

8   Petitioner has not established any other, nonfrivolous issues that appellate counsel should have

9   raised, s*ee Jones*, 463 U.S. at 751-54, and there has been no showing that, but for appellate

10  counsel's unprofessional errors, there was any reasonable probability that Petitioner would have

11  prevailed on appeal, *see Miller*, 882 F.2d at 1434 & n.9. The Superior Court's denial of this

12  claim was reasonable. *See* Pet. Ex. R at 12.

13

14  **VII.   Cruel and Unusual Punishment Claim**

15       Petitioner claims that his sentence constitutes cruel and unusual punishment.[3] Pet. at 62.

16  His sentence included an upper term of eleven years for the kidnapping count, a consecutive life

17  term for the torture conviction, and a concurrent jail term for resisting arrest.[4] RT 801-04.

18  Petitioner's upper term sentence on the assault counts of six and four years, respectively, were

19  stayed pursuant to California Penal Code § 654. RT 803. In addition, Petitioner was ordered to

20  pay a restitution fine of $10,000 pursuant to § 1202.4(b), and to register as a sex offender under

21  § 290. RT 804-05. Petitioner asserts that his indeterminate life sentence for torture was

22

23

24       [3]Petitioner raised this claim in his supplemental habeas petition to the California
    Supreme Court, which was summarily denied. Pet. Ex. W. Thus, there is no state court
25  opinion addressing the merits of Petitioner's Eighth Amendment challenge.

26       [4]The trial court imposed the upper term of imprisonment for each count after
    finding that the mitigating factors were outweighed by the aggravating factors, including
27  that the crimes involved "great violence, great bodily injury, threat of great bodily injury,
    and other acts disclosing a high degree of cruelty, viciousness, or callousness." RT 802.
28

48

1  disproportionate to the facts of this case. Pet. at 62. He further argues that excessive bail and
2  fines were imposed. Pet. at 66.

3  **A.  Legal Standard**

4  A criminal sentence that is not proportionate to the crime for which the defendant was
5  convicted violates the Eighth Amendment. *Solem v. Helm*, 463 U.S. 277, 303 (1983) (sentence
6  of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth
7  Amendment). But "'[o]utside the context of capital punishment, *successful* challenges to the
8  proportionality of particular sentences [will be] exceedingly rare.'" *Id.* at 289-90 (quoting
9  *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)). For the purposes of review under 28 U.S.C. §
10  2254(d)(1), it is clearly established that "[a] gross disproportionality principle is applicable to
11  sentences for terms of years." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). However, "[t]he
12  Eighth Amendment does not require strict proportionality between crime and sentence. Rather,
13  it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing v.*
14  *California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)
15  (Kennedy, J., concurring)). Substantial deference is granted to legislatures' determination of the
16  types and limits of punishments for crimes. *See United States v. Gomez*, 472 F.3d 671, 673-74
17  (9th Cir. 2006) (finding that Congress's decision to grant a reprieve from statutory minimums
18  only to certain categories of criminal defendants does not violate the Eighth Amendment).
19

20  A challenge to the proportionality of a sentence should be analyzed using objective
21  criteria, which include: (1) the gravity of the offense and the harshness of the penalty; (2) a
22  comparison of sentences imposed on other criminals in the same jurisdiction; and (3) a
23  comparison of sentences imposed for the same crime in other jurisdictions. *Solem*, 463 U. S. at
24  290-92. Under this proportionality principle, the threshold determination for the court is whether
25  Petitioner's sentence is "one of 'the rare case[s] in which a . . . comparison of the crime
26  committed and the sentence imposed leads to an inference of gross disproportionality.'" *United*
27

28

49

*States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) (quoting *Harmelin*, 501 U.S. at 1005). Only if such an inference arises does the court proceed to compare a petitioner's sentence with sentences in the same and other jurisdictions. *See Harmelin*, 501 U.S. at 1004-05; *Bland*, 961 F.2d at 129; *cf. Ewing*, 538 U.S. at 23 (noting that *Solem* does not mandate comparative analysis within and between jurisdictions). Where it cannot be said, as a threshold matter, that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. *See United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

**B.    Analysis**

Applying the *Solem* standard, the Court concludes that Petitioner's sentence was not disproportionate to his crime. Petitioner was convicted of multiple serious offenses, including torture under California Penal Code § 206, for which he received a life sentence as required under California law. Under the statute, Petitioner was found guilty of inflicting great bodily injury upon the person of another with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. *See* CALJIC No. 9.90. The jury found that Petitioner kidnaped and assaulted the victim with the intent to commit rape. CT 603. When police officers arrived at the scene, Petitioner resisted arrest. CT 607. The victim continues to suffer mentally and physically from the attack, deeply affecting her family members as well. RT 782. Given the circumstances surrounding the crime, this Court cannot say this is one of the "rare cases" where the penalty imposed raises an inference of "gross disproportionality." The threshold for an inference of gross disproportionality is quite high. *See, e.g., Ewing*, 538 U.S. at 14, 18 (sentence of 25 years to-life for conviction of grand theft with prior convictions was not grossly disproportionate); *Andrade*, 538 U.S. at 66, 67 (sentence of two consecutive terms of 25 years-to-life under California's "three strikes" regime when third strikes were "wobbler" offenses was not grossly disproportionate). While Petitioner did not

50

have a prior criminal record, that fact alone does not render a harsh punishment cruel and unusual when it is imposed in connection with a serious crime. *See, e.g., Harmelin*, 501 U.S. at 961, 1004-05 (mandatory sentence of life without possibility of parole for *first* offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).

Petitioner's claim that his bail was excessive also fails. The Bail Clause requires that when bail is set, it cannot be excessive, but it does *not* require that bail be available in all cases.[5] *See United States v. Salerno*, 481 U.S. 739, 752-54 (1987); *Carlson v. Landon*, 342 U.S. 524, 545 (1952). "The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." *Salerno*, 481 U.S. at 754. In setting bail, the State may take into account compelling government interests, such as public safety or the likelihood of flight to ensure a defendant's presence at trial. *Id.* at 754-55; *see also Stack v. Boyle*, 342 U.S. 1, 5 (1951) (fixing of bail must be based on standards relevant to purpose of assuring defendant's presence). Bail is not considered excessive merely because Petitioner is not able to pay the bail. *White v. Wilson*, 399 F.2d 596, 598 (9th Cir. 1968).

Applying these principles to the instant case, the bail set by the trial court was reasonable. Given the severity of charges, which included multiple sexual offenses and which carried the possibility of a life sentence, this Court cannot say that the $500,000 bail set by the trial court was excessive. Moreover, there is no indication that the bail amount prejudiced Petitioner or affected his conviction. *See Wilson*, 399 F.2d at 598. Petitioner's argument that reasonable bail would have allowed him to continue working and thus afford private counsel is meritless, as the Court already determined that trial counsel was effective. *See supra*, section V. With regard to

---

[5]There is no constitutional distinction between requiring excessive bail, which is prohibited by the Eighth Amendment, *see Danylocke v. Dalsheim*, 662 F. Supp. 961, 962 (S.D.N.Y. 1987), and denying bail altogether in the absence of legitimate reasons. *See Finetti v. Harris*, 609 F.2d 594, 599 (2d Cir. 1979) (citation omitted).

the restitution fine, the Court previously concluded that the amount set by the trial court was appropriate and in accordance with state law. *See supra*, section V.B.ii. Accordingly, Petitioner's challenge to the fine on the ground that it was excessive also fails.

Because we find no inference that Petitioner's sentence was "grossly disproportionate" to his crime, Petitioner's claim fails and further comparative analysis of Petitioner's sentence is unnecessary. *See Harmelin*, 501 U.S. at 1004-05; *Harris*, 154 F.3d at 1084. Petitioner's sentence does not violate the Eighth Amendment, and habeas relief is denied.

## VIII. Double-Jeopardy Claim

Petitioner asserts that the trial court violated his rights under the Double Jeopardy Clause. Pet. at 67. Specifically, he argues that the trial court's imposition of consecutive sentences for the kidnapping and torture charges under California Penal Code § 654 was unconstitutional because it resulted in multiple punishments for a single act or omission. Pet. at 69.

The guarantee against double jeopardy protects against multiple punishments for the same offense. *See Witte v. United States*, 515 U.S. 389, 395-96 (1995); *United States v. DiFrancesco*, 449 U.S. 117, 129 (1980). Protection against multiple punishments is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. *See Garrett v. United States*, 471 U.S. 773, 793 (1985); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are "multiple" is essentially one of legislative intent. *See Missouri v. Hunter*, 459 U.S. 359, 366-68 (1983).

In the federal courts the test established in *Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("same elements" test), ordinarily determines whether crimes are indeed separate and whether cumulative punishments may be imposed. *Rutledge v. United States*, 517 U.S. 292, 297 (1996); *Ohio v. Johnson*, 467 U.S. at 499 n.8. Under that test, the Double Jeopardy Clause is not violated if "each [offense] requires proof of a fact which the other does not." *Blockburger*, 284

52

U.S. at 304.

The trial court imposed consecutive sentences for the kidnapping and torture charges "because they were independent and not merely incidental to each other. Defendant entertained several criminal objectives." RT 803. The trial court's decision was reasonable and in accordance with state law. Kidnapping with intent to commit rape contains distinct elements and requires proof of facts which torture does not. *See Blockburger*, 284 U.S. at 304. Specifically, as to the kidnapping charge the jury had to find that Petitioner forcibly took, held, and detained the victim, and carried her into another part of the county, with the intent to commit rape. CT 542-43. By contrast, as to torture, the jury had to find that Petitioner inflicted great bodily injury with the intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, and for sadistic purpose. CT 543. The crimes clearly have distinct conduct and intent elements. Thus the trial court was correct in finding that Petitioner had separate criminal objectives, and the court's application of California Penal Code § 654 did not violate double jeopardy principles.

## IX. Equal Protection Claim

Petitioner claims that the imposition of multiple punishments violated his rights under the Equal Protection Clause. Pet. at 70. He asserts that the trial court applied state penal law arbitrarily and in a discriminatory fashion. Pet. at 71. Petitioner's claim is without merit. The Court has concluded that the imposition of multiple punishments was reasonable and in accordance with state law. Beyond that, the Equal Protection Clause does not assure uniformity of judicial decisions or immunity from judicial error; otherwise, every alleged misapplication of state law would constitute a federal constitutional question. *See Alford v. Rolfs*, 867 F.2d 1216, 1219 (9th Cir. 1989) (citing *Beck v. Washington*, 369 U.S. 541, 554-55 (1962)); *see, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1083 (9th Cir. 2006) (petitioner cannot establish equal protection claim warranting habeas relief simply because, or if, the Nevada Supreme Court misapplied

Nevada law or departed from its past precedents). Accordingly, Petitioner's claim concerning the state trial court's application of California penal law is not entitled to federal habeas review by this Court.

## X.   Blakely-Apprendi Claims

### A.   Aggravating Factors

Petitioner argues that the trial court improperly imposed an upper term sentence based on aggravating factors not presented to a jury and found true beyond a reasonable doubt. Pet. at 71. He claims that this was constitutional error under *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Pet. at 71.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury. U.S. Const. amend. VI. The Supreme Court's Sixth Amendment jurisprudence was significantly expanded by *Apprendi* and its progeny, which extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations as well as the actual elements of the crime. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. *Blakely*, 542 U.S. at 303-04. In *Cunningham v. California*, 127 S. Ct. 856 (2007), the Court held that California's determinate sentencing law ("DSL") violated the Sixth Amendment because it allowed the sentencing court to impose an elevated sentence based on aggravating facts that it found to exist by a preponderance of the evidence. *Id.* at 860, 870-71. *Cunningham* essentially applied *Blakely* to California's sentencing scheme.

54

1    Neither *Blakely* nor *Cunningham* was decided before Petitioner's conviction became
2    final. *Blakely* does not apply retroactively to cases on collateral review. *Schardt v. Payne*, 414
3    F.3d 1025, 1036 (9th Cir. 2005). In *Schardt*, the petitioner's conviction became final on
4    December 22, 2000, after *Apprendi* was decided on June 26, 2000, but before *Blakely* was
5    announced on June 24, 2004. *Id.* at 1034. The Ninth Circuit found that although petitioner's
6
7    sentence violated the Sixth Amendment's right to a jury under *Blakely*, habeas relief was not
8    available because the *Blakely* decision announced a "new rule" that does not apply retroactively
9    to cases on collateral review. *Id.* (citing *Teague v. Lane*, 489 U.S. 288, 301 (1989)). Similarly,
10   Petitioner's conviction became final upon direct review by the California Supreme Court in
11   August 2000, years before *Blakely* was decided. *Cf. Butler v. Curry*, 528 F.3d 624, 633 (9th Cir.
12   2008) ("[Petitioner's] conviction became final . . . when the time for seeking direct review of the
13   California Court of Appeal decision in his case expired). Thus, as in *Schardt*, Petitioner is not
14   entitled to relief on this claim because the rule in *Blakely* does not apply retroactively to this
15   case. *Cunningham*, which was essentially a California-specific application of *Blakely*, also has
16   not been made retroactive to cases on collateral review before *Blakely* was decided. *See Butler*
17   *v. Curry*, 528 F.3d 624, 633-35, 639 (9th Cir. 2008).

18   In *Butler*, the court held that *Cunningham* did apply to a petitioner whose conviction
19   became final after *Blakely* was decided. *Id.* In so concluding, the court examined the "legal
20   landscape," *id.* at 634 (quoting *Beard v. Banks*, 542 U.S. 406, 411 (2004); *Teague*, 489 U.S. at
21   301), at the time of Petitioner's sentence and concluded: "*Taken together*, *Apprendi, Blakely,*
22   and *Booker*, firmly established that a sentencing scheme in which the maximum possible
23   sentence is set based on facts found by a judge is not consistent with the Sixth Amendment." *Id.*
24   at 635 (emphasis added). However, Petitioner here is not entitled to retroactive application of
25   the *Blakely* rule.
26

27
28

55

**B. Consecutive Sentences**

Petitioner also claims that the trial judge improperly imposed consecutive sentences without presenting the facts supporting that decision to a jury. Pet. at 76. He argues that this was a further violation of the *Blakely* mandate that all facts relevant to the defendant's guilt or penalty over the statutory maximum be found by a jury beyond reasonable doubt. Pet. at 76-77.

Petitioner's claim is meritless because *Apprendi* and its progeny do not apply to consecutive sentences for multiple convictions, but rather to enhancements for a single offense. *See Apprendi*, 530 U.S. at 474 (noting that sentences for separate counts have "no . . . relevance" to disposition); *Blakely*, 542 U.S. at 299 n.2 (noting that imposition of sentence for additional agreed charge "not relevant"). A trial court has discretion to impose consecutive sentences where, as here, the petitioner has been convicted of multiple felonies.

**C. Sex Offender Registration Requirement**

Petitioner claims that he had no notice of the sex offender registration requirement, and this was a sentence enhancement that further violated *Apprendi* and its progeny. Pet. at 82.

Petitioner's argument fails. Section 290 of the California Penal Code requires, *inter alia*, that convicted sex offenders register with the chief of police of the city in which they are domiciled and provides for a limited release to the public of information about the sex offender. The registration requirement applies to those, like Petitioner, convicted of assault with intent to commit rape. Cal. Penal Code § 290(b). Registration is mandatory for all such offenders. *Id.* With respect to Petitioner's claim that he received no notice of the registration requirement, section 290 does not constitute retroactive punishment prohibited by the Ex Post Facto Clause and does not violate the notice requirement under the Due Process Clause. *Hatton v. Bonner*, 356 F.3d 955, 966-68 (9th Cir. 2004). Regarding Petitioner's claim that registration is a sentencing enhancement that should have been presented to a jury, the Ninth Circuit has determined that the sex offender registration statute is regulatory or non-punitive in nature. *Id.*

at 962. Accordingly, it is not subject to analysis under *Apprendi* and its progeny, which concern penalty enhancements affecting the length of imprisonment. *See Apprendi*, 530 U.S. at 468; *Blakely*, 542 U.S. at 303; *Cunningham*, 127 S. Ct. at 860. In any event, as discussed above, Petitioner's *Blakely* claim is barred. *See Teague*, 489 U.S. at 301.

## PENDING MOTION

On March 19, 2008, Petitioner filed a motion seeking appointment of counsel and requesting an evidentiary hearing and discovery regarding his ineffective assistance of trial and appellate counsel claims (docket no. 38). Petitioner had earlier filed separate motions seeking the same relief (docket nos. 21, 36), which were previously denied in separate orders. Petitioner's motion for an evidentiary hearing was denied without prejudice to the Court's *sua sponte* reconsideration in considering the petition on the merits (docket no. 37). Petitioner's motion seeking appointment of counsel is DENIED, given Petitioner's more than adequate self-representation on this matter (docket no. 38).

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997). However, Rule 6(a) of the Federal Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, provides that a "party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Good cause for discovery under Rule 6(a) is shown "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . .'" *Id.* at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005).

This Court has considered Petitioner's motion for a discovery and an evidentiary hearing after evaluating the motion and the petition on the merits. Petitioner has failed to establish that a

57

1  hearing would provide any evidence to show that when the facts are developed further,

2  Petitioner would be entitled to relief. *See, Pham*, 400 F.3d at 743; *Downs*, 232 F.3d at 1041.

3  Therefore, the motion seeking discovery and an evidentiary hearing are DENIED in this Court's

4  discretion (docket no. 38).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk
shall enter judgment for Respondent and close the file.

IT IS SO ORDERED.

DATED:   AUG 2 5 2008

JEFFREY S. WHITE
United States District Judge

58

## UNITED STATES DISTRICT COURT

### FOR THE

### NORTHERN DISTRICT OF CALIFORNIA

VICTORY,

        Plaintiff,

v.

LEWIS,

        Defendant.

        /

Case Number: CV03-01061 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 25, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Christopher William Grove
Attorney at Law
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

Michael Victory
CDC P-07048
Pleasant Valley State Prison
P.O. Box 8500
Coalinga, CA 93210

Dated: August 25, 2008

Jennifer Ottolini

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk